No. 22-16693

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
―――――――――――――――――――――

IN RE JUUL LABS, INC., MARKETING SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION
―――――――――――――――――――――

ALTRIA GROUP, INC., PHILIP MORRIS USA INC., ALTRIA CLIENT
SERVICES LLC, ALTRIA GROUP DISTRIBUTION COMPANY,
ALTRIA ENTERPRISES LLC,

*Appellants-Defendants,*

v.

NATIONWIDE PURCHASER CLASS PLAINTIFFS AND NATIONWIDE
YOUTH CLASS PLAINTIFFS,

*Appellees-Plaintiffs.*

―――――――――――――――――――――

On Appeal from the United States District Court
for the Northern District of California
Case No. 19-MD-02913-WHO; MDL No. 2913
The Honorable William H. Orrick
―――――――――――――――――――――

BRIEF OF APPELLANTS ALTRIA GROUP, INC.,
PHILIP MORRIS USA INC., ALTRIA CLIENT SERVICES LLC, ALTRIA
GROUP DISTRIBUTION COMPANY, AND ALTRIA ENTERPRISES LLC

**[REDACTED]**

―――――――――――――――――――――

**Counsel listed on inside cover**

John C. Massaro
David E. Kouba
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
D.C.  20001
Telephone:  (202) 942-5000

James M. Rosenthal
Wilkinson Stekloff LLP
2001 M Street, NW, 10th Floor
Washington, D.C.  20036
Telephone:  (202) 847-4000

Lisa S. Blatt
Sarah Harris
Williams & Connolly LLP
680 Maine Ave. NW Washington,
Washington, D.C. 20001
Telephone:  (202) 434-5050

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants Altria Group, Inc., Philip Morris USA Inc., Altria Client Services LLC, Altria Group Distribution Company, and Altria Enterprises LLC, by and through their undersigned counsel, make the following disclosures:

1.    **Appellant Altria Group, Inc.**  Appellant Altria Group, Inc. has no parent company.  No publicly owned company owns 10% or more of Altria Group, Inc's stock.

2.    **Appellant Philip Morris USA Inc.**  Appellant Philip Morris USA Inc. is a wholly-owned subsidiary of Altria Group, Inc.  Altria Group, Inc. is the only publicly held company that owns 10% or more of Philip Morris USA Inc.'s stock.

3.    **Appellant Altria Client Services LLC.**  Appellant Altria Client Services LLC's parent company is Altria Enterprises II LLC.  Altria Enterprises II LLC is a wholly owned subsidiary of Altria Group, Inc.

4.    **Appellant Altria Group Distribution Company.**  Appellant Altria Group Distribution Company's parent company is Altria Enterprises II LLC.  Altria Enterprises II LLC is a wholly owned subsidiary of Altria Group, Inc.

5.    **Appellant Altria Enterprises LLC.**  Appellant Altria Enterprises LLC is a wholly owned subsidiary of Altria Group, Inc.

Dated:  February 1, 2023          By:     /s/ John C. Massaro

John C. Massaro
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
Telephone:  202-942-5000
Facsimile:  202-942-5999
John.Massaro@arnoldporter.com

*Counsel for Appellants Altria Group,*
*Inc., Philip Morris USA Inc., Altria*
*Client Services LLC, Altria Group*
*Distribution Company, and Altria*
*Enterprises LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

QUESTIONS PRESENTED ..................................................................... 3

STATEMENT OF JURISDICTION ......................................................... 4

STATEMENT OF THE CASE .................................................................. 5

    A.   JLI's JUUL Products ............................................................... 5

    B.   Altria's Investment in JLI in December 2018 and Retail Services in 2019–2020 ................................................................. 6

    C.   The MDL and Operative Complaint ...................................... 8

    D.   The Class Certification Proceedings .................................... 11

    E.   The District Court's Class Certification Order ..................... 25

STANDARD OF REVIEW ..................................................................... 27

ARGUMENT ........................................................................................... 27

I.   PLAINTIFFS FAILED TO DEMONSTRATE THAT INJURY AND DAMAGES ATTRIBUTABLE TO ALTRIA CAN BE RESOLVED ON A CLASS-WIDE BASIS ........................................ 27

    A.   Plaintiffs' One-Size-Fits-All Model Violated *Comcast* With Respect to Altria ............................................................ 27

    B.   The District Court Erred In Finding *Comcast* Could Be Satisfied After Certification or Through "Conspiracy" Liability .............................................................................. 30

II.  COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES GIVEN THE UNDISPUTED VARIABILITY IN THE CLASSES ............................ 35

    A.   RICO's Causation Requirement Creates Predominating Individualized Issues Here ..................................................... 35

    B.   The District Court Erred By Misapplying *Bridge* and Adopting a Novel "Critical Mass" Causation Theory ................................. 42

C.     Article III's Injury-in-Fact and RICO's Injury To Business or Property Requirements Raise Predominating Individual Issues .............................. 45

CONCLUSION ........................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ...................................................46

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) ..................................................46

*Beaty v. Ford Motor Co.*,
2021 WL 3109661 (W.D. Wash. July 22, 2021) .....................48

*In re Blood Reagents Antitrust Litig.*,
783 F.3d 183 (3d Cir. 2015) ..................................................31

*Bowerman v. Field Asset Servs., Inc.*,
39 F.4th 652 (9th Cir. 2022) .............................................29, 47

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ..........................................................42, 43

*Bryant v. Mattel, Inc.*,
2010 WL 3705668 (C.D. Cal. Aug. 2, 2010) .........................34

*Cadle Co. v. Flanagan*,
2005 WL 8167447 (D. Conn. Feb. 11, 2005) .........................46

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..................................................... *passim*

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
232 F.3d 173 (3d Cir. 2000) ..................................................46

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ..............................................................37

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) ..................................................................35

*Holmes v. Sec. Prot. Corp.*,
503 U.S. 258 (1992) ..............................................................44

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ...................................................................31

*Mattel, Inc. v. MGA Ent., Inc.*,
  2010 WL 11463911 (C.D. Cal. Sept. 3, 2010) ......................................34

*McLaughlin v. American Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ...................................................................37

*Neder v. United States*,
  527 U.S. 1 (1999).....................................................................................45

*Oki Semiconductor Co. v. Wells Fargo Bank*,
  298 F.3d 768 (9th Cir. 2002) ...........................................................32, 33

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) ..................................... 27, 32, 47

*Or. Laborers-Emp. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) .................................................................44

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) .................................................................38

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*,
  943 F.3d 1243 (9th Cir. 2019) ...............................................................43

*Phillips v. Apple Inc.*,
  2016 WL 1579693 (N.D. Cal. Apr. 19, 2016)......................................38

*Postpichal v. Cricket Wireless, LLC*,
  2021 WL 3403146 (N.D. Cal. Aug. 4, 2021) ........................................43

*Poulos v. Caesars World, Inc.*,
  379 F.3d 654 (9th Cir. 2004) ........................................................ *passim*

*Steele v. Hosp. Corp. of Am.*,
  36 F.3d 69 (9th Cir. 1994) ...............................................................45, 47

*United States v. Yang*,
  2019 WL 5536213 (N.D. Cal. Oct. 25, 2019) .......................................45

*United States v. Bogucki*,
    2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ........................................45

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) .................................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................49

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ...................................................................31

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010) ...............................................................27

*Zito v. Leasecomm Corp.*,
    2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) ....................................37

## Constitutional Provisions

U.S. Const. art. III ................................................................... 45, 47, 48, 49

## Statutes and Regulations

18 U.S.C. § 1962(c) .......................................................................................8

18 U.S.C. § 1962(d) ......................................................................................8

18 U.S.C. § 1964(c) ...............................................................................35, 45

28 U.S.C. § 1292(e) ......................................................................................4

28 U.S.C. § 1332(d) ......................................................................................4

*Deeming Tobacco Products to be Subject to the Federal Food, Drug,
    and Cosmetic Act*, 81 Fed. Reg. 28973 (May 10, 2016) ........................5

## Rules

Fed. R. Civ. P. 23 ................................................................................ *passim*

Fed. R. Civ. P. 23(b)(3)..........................................................................2, 28

**Other Authorities**

U.S. Food & Drug Admin., *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, Guidance for Industry (2020) ................................................................................................................5, 8

## PRELIMINARY STATEMENT

This Court should reverse the district court's erroneous certification of two sprawling, multi-billion-dollar federal RICO classes against Altria as contrary to longstanding precedent and Rule 23's settled limitations on when a case can be heard on a class-wide basis.[1]

This multidistrict litigation involves the alleged false marketing and sale of JUUL products that Altria never designed, manufactured, or sold. Instead, Defendant JUUL Labs Inc. ("JLI")—which has recently announced that it is settling with Plaintiffs—made, sold, and marketed JUUL. The crux of the lawsuit is that, starting in 2015, JLI falsely marketed its products causing purchasers—Plaintiffs say every single purchaser—to pay more than the products were worth. Even in Plaintiffs' telling, Altria has no connection to most of the alleged conduct or harms. Years after JLI's alleged false marketing began, Altria made a minority investment in JLI in late 2018, and then provided limited retail services to JLI from 2019-2020. But in a case of the tail wagging the dog, the district court found that Altria—but not JLI—should be subject to nationwide civil RICO classes seeking upwards of $6 billion after trebling.[2]

---

[1] "Altria" refers to Altria Group, Inc., Philip Morris USA Inc., Altria Client Services LLC, Altria Group Distribution Company, and Altria Enterprises LLC.

[2] The district court also certified RICO claims against various officers and directors of JLI, and California state-law classes against JLI and the directors and officers, all

Footnote continued on next page

The district court found certification permissible only by eliminating Plaintiffs' burden to establish three core requirements of Rule 23.

*First*, the district court abdicated its duty under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), to ensure at the certification stage that a plaintiff's injury and damages model "measure[s] only those damages attributable" to a plaintiff's theory of liability. Plaintiffs presented an injury and damages model obviously designed to address the allegations against JLI, not Altria. The model focused on the entire class period, never addressing that Altria could not have engaged in any misconduct before it was involved with JLI, and never addressing that even Plaintiffs allege Altria was only involved in some of the purported schemes. Plaintiffs nevertheless insisted that the district court should use the *same model* for JLI and Altria, and the district court agreed. 1-ER-33. The result is a model that is like a cheap suit that's ten times too big. But one size does not fit all under *Comcast*, and this Court should reverse.

*Second*, the district court held that Rule 23(b)(3)'s requirement that a plaintiff prove that common questions "predominate over individual ones," *Comcast*, 569 U.S. at 34, was satisfied, notwithstanding the undisputed variability in when, whether, why, and how various class members purchased JUUL products. The court

---

of whom have announced that they are settling. This Court has administratively closed JLI and the individual defendants' separate appeals.

acknowledged that, under this Court's decision in *Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004), such variability is critical in determining whether a RICO class can be certified, but treated that decision as having been silently overturned by an inapposite Supreme Court case. 1-ER-24–25.

The court further avoided the variability problem by adopting a "critical mass" causation theory never recognized by this or any other court of appeals. 1-ER-35–37. Under this novel theory, so long as *some* consumers were deceived by alleged misrepresentations about a product, *all* consumers can obtain treble damages under RICO, even ones who never were exposed to or influenced by the alleged fraud. If upheld, this approach will encourage any plaintiff to cast run-of-the-mill consumer fraud claims as federal racketeering to obtain a shortcut to class certification.

*Finally*, the district court certified the classes even though many class members did not suffer any injury, much less an injury to "business or property" as RICO requires. Determining the injured from the uninjured too will create predominating individualized issues precluding class certification.

For these and the other reasons set forth below, this Court should reverse.

## QUESTIONS PRESENTED

1.     Whether the district court erred in certifying Plaintiffs' civil RICO claims against Altria despite recognizing that Plaintiffs' model indisputably did not address Altria's limited alleged role in the purported wrongdoing.

2.      Whether the district court erred in certifying Plaintiffs' civil RICO claims against Altria despite undisputed evidence that class members varied widely on whether they ever saw any alleged false advertisement, whether they purchased products "by reason of" any alleged misconduct, and whether Altria's conduct caused any class member to purchase JUUL products.

3.      Whether the district court erred in certifying Plaintiffs' civil RICO claims against Altria despite clear evidence that many class members suffered no injury-in-fact or to "business or property" and Plaintiffs set forth no mechanism to distinguish the injured from uninjured members without predominating individualized inquiries.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). On June 28, 2022, the district court granted Plaintiffs' motion for class certification. 1-ER-3–96. On July 11, 2022, Altria petitioned for permission to appeal from the class certification order under Federal Rule of Civil Procedure 23(f). On October 24, 2022, this Court granted Altria's Rule 23(f) petition. ECF No. 2. This Court has jurisdiction to review the district court's class certification order under 28 U.S.C. § 1292(e).

## STATEMENT OF THE CASE

### A.    JLI's JUUL Products

In 2015, JLI introduced JUUL products onto the market.  *E.g.*, 2-ER-138, 157 (¶¶ 82, 129); 1-ER-10–11.  JUUL products include an electronic "JUUL device" that heats a nicotine-containing liquid into a vapor that the consumer inhales and "JUUL pods" that contain this liquid.  *See* 2-ER-135–36 (¶ 76).

In 2016, the Food & Drug Administration issued a rule deeming electronic nicotine delivery systems ("ENDS") such as JUUL to be "tobacco products" subject to the FDA's authority.  *Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act*, 81 Fed. Reg. 28973 (May 10, 2016).  The FDA permitted JUUL and other ENDS products to remain on the market pending further review, recognizing "the potential public health benefit of noncombusted options by which some adult smokers might seek to transition completely away from combusted tobacco products," like cigarettes.  *See* U.S. Food & Drug Admin., *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, *Guidance for Industry* 21 (2020).

Plaintiffs' claims focus on the design of JUUL products and allegations that JLI improperly marketed and sold JUUL products since JUUL's 2015 introduction.  *E.g.*, 2-ER-117, 148–68, 215–32 (¶¶ 13, 106–63, 305–59); 1-ER-19.

## B.    Altria's Investment in JLI in December 2018 and Retail Services in 2019–2020

Plaintiffs do not allege that Altria had any involvement in the design, manufacturing, or labeling of JUUL products. *See, e.g.*, 2-ER-117–118 (¶¶ 13, 17). To the contrary, until December 2018, Altria owned an e-vapor company that competed against JLI. *E.g.*, 2-ER-124–26 (¶ 43).

Nor do Plaintiffs allege that Altria played a role in any youth marketing, much less other conduct which purportedly took place in 2015 and 2016, before Altria is alleged to have had any involvement with JLI. *See* 2-ER-374–76 (¶¶ 897–912); 1-ER-30–31.

Rather, Plaintiffs allege that Altria's business dealings with JLI began in 2017—almost two years after JUUL's introduction and much of the alleged misconduct. *E.g.*, 2-ER-366 (¶ 366); 1-ER-31. From the spring of 2017 until December 2018, Altria and JLI engaged in on-again, off-again negotiations and communications about a possible investment. 2-ER-279–92 (¶¶ 497–531).

After Altria's vapor products failed—and after JLI announced that it had adopted new programs to address underage vaping, ceased any marketing on social

media, and added an FDA warning to JUUL products—Altria invested in JLI. *See, e.g.*, 1-ER-27, 49; 6-ER-1514–18; 6-ER-1530.[3]

On December 20, 2018, Altria purchased a 35% minority, non-voting interest in JLI. 2-ER-117 (¶ 17). At the same time, Altria and JLI entered into a Services Agreement that allowed JLI to request and purchase services from Altria as it would from any other vendor. 2-ER-117–18 (¶¶ 17–18). Under the Agreement, in 2019, JLI contracted for Altria to send coupons for JUUL products to age-verified adult smokers in Altria's database and included the coupons in certain brands of cigarettes manufactured by Philip Morris USA. 2-ER-308 (¶¶ 582–83). In 2019, Altria also provided JLI with distribution and supply chain management services to a small number of retail stores across seven different states as a part of a pilot program, and also provided long-term warehousing services for excess JUUL products in Richmond, Virginia, and freight shipping from Louisville, Kentucky to Richmond.

---

[3] Altria's investment in JLI was challenged by the FTC as anticompetitive. *See In re Altria Grp. Inc. and JUUL Labs Inc*., No. 9393, Initial Decision at 29 (F.T.C. Feb. 23, 2022) (public version), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/d09393altriainitialdecisionpublic.pdf. After an adjudicative proceeding before the FTC that lasted several weeks, the judge dismissed the complaint. The decision included findings of fact concerning the negotiations and Altria's lack of control over JLI, which conflict with the allegations in Plaintiffs' complaint. As in the Rule 23(f) proceedings, Plaintiffs will likely seek to distract from the class certification defects by making inflammatory allegations that distort the record. Rest assured, Altria disputes Plaintiffs' slanted account, but here will focus on Plaintiffs' *allegations* and the record relevant to class certification.

2-ER-304–05 (¶ 574). Also in 2019, Altria provided sales support services to JLI in additional retail stores and pre-book services for chain accounts. *Id.* In 2019 and early 2020, Altria leased shelf space in some stores to JLI and retailers replaced Altria's failed Nu Mark vaping products on that shelf space with JUUL products. *E.g.*, 2-ER-303 (¶ 570). Finally, Altria provided certain regulatory support services to JLI, which are not consumer-facing and are not at issue here.

Altria and JLI amended their Services Agreement in January 2020, and since March 2020 Altria has not provided JLI retail services and has "limit[ed] its support to regulatory [affairs]." 2-ER-304 (¶ 573).

### C. The MDL and Operative Complaint

In October 2019, the Judicial Panel on Multidistrict Litigation created MDL 2913 to coordinate JUUL-related lawsuits filed across the country. 4-ER-911. In March 2020, Plaintiffs filed a master class action complaint that included civil RICO and state-law claims against JLI, certain directors and officers of JLI ("the individual defendants"), and Altria. 4-ER-940. The district court established a bellwether process in the class actions that would first consider claims under RICO and California state law. The state-law claims against Altria were later dismissed. Thus, the only claims that Plaintiffs moved to certify against Altria were their civil RICO claims under sections 18 U.S.C. § 1962(c) and 1962(d).

### 1. The Alleged Acts of Racketeering

Plaintiffs allege that the individual defendants conducted five purported RICO schemes at different points during the course of the enterprise: "fraudulent marketing"; "youth access"; "flavor preservation"; "cover-up"; and "nicotine content misrepresentation." 1-ER-26, 36–37 n.27; 2-ER-374–76 (¶¶ 897–912). Plaintiffs do not allege that Altria engaged in the fraudulent marketing and youth access alleged schemes, which largely occurred before Altria's involvement with JLI even began. *See* 1-ER-30; 2-ER-366, 374–76 (¶¶ 865, 897–912).

Rather, Plaintiffs allege that Altria engaged in a "flavor preservation" scheme by sending a letter to the FDA on October 25, 2018 (when Altria had its own products competing with JUUL) asserting that the FDA should ban flavored vaping products, but keep certain mint-flavored products available to adult consumers. 2-ER-377–79 (¶¶ 922–29). Plaintiffs allege that Altria engaged in a "cover up" of JLI's alleged youth marketing—after that conduct already had stopped and JLI was already being sued for it—when disseminating "Make the Switch" advertisements for JUUL products to adult smokers. 2-ER-379, 381–82 (¶¶ 930, 942–43, 949–950). In other words, Plaintiffs contend that these advertisements were deliberately targeted at adults supposedly to hide the fact that prior advertisements (from before Altria's involvement) were targeted at underage consumers.

Finally, Plaintiffs allege that Altria took part in a "nicotine content misrepresentation" scheme by helping JLI distribute JUUL products that allegedly misstated the percentage of nicotine they contained. 2-ER-376–77 (¶¶ 913, 920–21).

## 2. The Alleged RICO "Enterprise"

Plaintiffs' theory of RICO liability has evolved. Initially, Plaintiffs alleged that an association-in-fact enterprise had been formed "by at least 2015"—long before Altria's alleged involvement began. 4-ER-909 (¶¶ 715–16). This "early enterprise" obviously excluded Altria, and included only JLI and the individual defendants. 4-ER-907–10 (¶¶ 705, 718). Plaintiffs alleged that Altria joined this purported association-in-fact enterprise years later, sometime around the spring 2017. 4-ER-909–10 (¶¶ 909–10).

The district court dismissed this initial RICO theory for failure to state a claim. The court found that Plaintiffs failed to "allege[] the existence of a distinct [e]nterprise, separate and apart from the general business of JLI." 4-ER-901. The court further concluded that Plaintiffs' Altria-specific allegations failed to establish that "Altria actively joined an existing RICO enterprise and then conducted or participated in the conduct of the enterprises affairs." 4-ER-904 (internal quotation marks omitted). The court granted Plaintiffs leave to amend.

Plaintiffs' amended complaint took a drastically different approach to RICO's enterprise requirement. Plaintiffs dropped JLI as a RICO defendant and instead alleged that JLI *itself* was the RICO enterprise and that the individual defendants—and, for a period of time, Altria—directed and controlled the enterprise. 2-ER-365 (¶¶ 856–66).

Altria and the individual defendants again moved to dismiss the RICO claims. Although the district court found no "apposite caselaw" supporting the JLI-as-enterprise theory, it denied the motion. 2-ER-107–110.

Altria's alleged role in this enterprise is limited. *See* 1-ER-32. Plaintiffs allege that the RICO scheme began in 2015 with JUUL's introduction under the direction of the individual defendants, and do not allege any involvement by Altria before "Spring 2017 at the earliest." 1-ER-30–31; *see also* 2-ER-366 (¶ 865) ("as early as Spring 2017"). And, as noted, Altria is alleged to have engaged in only three of the five purported schemes. *E.g.*, 1-ER-30–31.

### D.     The Class Certification Proceedings

Plaintiffs moved to certify their RICO claims against the individual defendants and Altria (but not JLI) on behalf of two nationwide classes—one that included everyone who purchased JUUL in the United States at a brick-and-mortar or online retailer and one that included everyone who did so while under age eighteen. 1-ER-4.

Plaintiffs also moved to certify California state-law claims against JLI and the individual defendants (but not Altria) on behalf of two California classes—one that included everyone who purchased JUUL in California and one that included everyone who did so while under age eighteen.  1-ER-4–5.

### 1.    The Undisputed Evidence of Variability in JLI's Marketing During the Class Period

The evidence showed—and the district court found—that marketing and labeling for JUUL products and public information available to class members concerning JUUL varied significantly across the class period.

*JUUL's marketing.*  Plaintiffs' experts acknowledged that both the content and channels of JUUL marketing varied substantially over time.  The proposed class period encompasses several different marketing campaigns with very different messages, as well as periods in which JLI ran virtually no advertising at all.  *See* 6-ER-1493–94 (344:21–345:7, 354:23–355:12); 6-ER-1485–86 (40:9–15, 73:13–25).  Plaintiffs focused heavily on the "Vaporized" campaign, *see, e.g.*, 2-ER-216–32 (¶¶ 310–59), which ran for only four months from June 2015 to October 2015, years before Altria's involvement with JLI.  *See* 2-ER-101; 6-ER-1502–03.  A significant rebranding in 2016 resulted in product-focused ads showing only the JUUL device or JUUL pods without human models.  6-ER-1493 (342:24–343:6).

In 2018, JLI launched the "Make the Switch" campaign, which featured testimonials from former adult cigarette smokers and targeted smokers age 35 and

older.  6-ER-1487 (112:10–17).  Similarly, while Plaintiffs' allegations emphasize JLI's use of social media and influencers, *see* 1-ER-30, 46–47, JLI had ceased marketing via either of these channels before Altria invested in JLI in December 2018.  *See supra* pp. 6–7.

*JUUL's labeling and packaging.*  Plaintiffs' claims are based in large part on information that allegedly was not disclosed.  But for large portions of the class period, JUUL labeling and packaging included disclosures concerning nicotine, addiction potential, and health risks.  By May 2018—more than six months before Altria's investment in JLI—all JUUL packages contained FDA-mandated black-box nicotine warnings stating **"WARNING: This product contains nicotine. Nicotine is an addictive chemical."**  6-ER-1286–87; 6-ER-1290–95  And in late 2018, the front of JUULpod packaging stated that the "strength" percentage was a "nicotine strength" percentage.  6-ER-1521; 6-ER-1523–29.  Class members thus received different information during the class period depending on when they purchased JUUL products.

*Available JUUL products.*  JUUL also has been available in different flavors and different strengths over the class period.  When JUUL launched in 2015, it was available in four flavors with a nicotine concentration of 5% by weight.  6-ER-1512.  JUUL introduced additional flavors later in the class period as well as 3% pods that were not widely available until 2018.  *Id.*  In November 2018, again before Altria's

investment, JLI stopped selling fruit, crème, mango, and cucumber flavors at retail. *Id.* These flavors were discontinued online by October 2019, and JLI stopped selling mint products in November 2019. *Id.*

*Pre-investment preventative measures*. Before Altria invested in JLI, JLI took a number of voluntary steps to prevent youth usage that varied over the class period. For example, in August 2017, JLI raised the minimum purchase age for its e-commerce website to 21, even though local laws permitted sales to individuals 18 years and older. 6-ER-1537 (532:23–535:13); 6-ER-1530. In April 2018, JLI announced its support of state and federal initiatives to raise the legal age of purchase for tobacco products to 21. 6-ER-1540–41 (554:3–555:6); 6-ER-1530. Also in 2018, JLI stopped selling flavored products at retail establishments, ceased social media marketing, and ran "What Parents Need to Know" ads on the radio, in digital channels, and in newspapers. 6-ER-1544–45 (566:19–567:23); 6-ER-1515–18; 6-ER-153; 6-ER-1504. In November 2018, again before Altria's investment, JLI announced an array of programs that it was taking to combat underage use. *See* 6-ER-1514–18; 6-ER-1530.

All of these activities, which potentially affected class members' exposure to and perceptions of JUUL products, took place before Altria invested in and began providing limited retail services to JLI.

### 2. The Undisputed Evidence of Variability In Why, When, and Where Class Members Purchased JUUL Products

Discovery from class representatives and individual plaintiffs showed that class members vary widely as to what they believe about JUUL, how they formed their beliefs, when and why they first used JUUL, why they continued to use JUUL, where they purchased JUUL, and how they used JUUL. The variability is relevant to causation—whether determining if Defendants' conduct, or some other factor, caused each class member to purchase JUUL present predominating individualized issues.

**_When class members started using JUUL._** Many class members claim that they began using and became addicted to JUUL before spring of 2017 when Altria allegedly began negotiating with JLI. _See_ 3-ER-399 to 4-ER-892. An even higher proportion began using JUUL before Altria invested in JLI in December 2018. _Id._ And some class members, ███████████████████████████

████████████████████████████████████████

███. 6-ER-1306, 1308 (68:9-17, 286:5-287:7).

**_Beliefs about JUUL, nicotine, and addiction._** Many class members understood when they began using JUUL that doing so could be harmful, that JUUL

contained nicotine, and/or that JUUL could be addictive.[4]  Some class members

believed as soon as they used JUUL that they had received more nicotine than they

had from cigarettes based on their physical reaction.[5]  Other class members claim

that they did not know JUUL contained nicotine the first time they used JUUL but

became aware of that shortly thereafter and continued to purchase JUUL products.[6]

---

[4] *See, e.g.*, 6-ER-1314 (90:13–91:12) (███████████████████████████);
6-ER-1319–20 (23:6–13, 39:9–14) (██████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████████████████); 6-ER-1328–29 (221:5–224:2) (█████████
████████████████████); 6-ER-1332 (126:3–21) (█████████████████████
███████████████████████████████████████████); 6-
ER-1336–37 (23:7–12, 29:16–20) (████████████████████████████████████
████████████).

[5] *See, e.g.*, 6-ER-1374 (24:23–16) (███████████████████████████
█████████████████████████████████████████████); 6-ER-1384 (208:23–
209:14) (███████████████████████████████████████████████
████████████████████████████████████).

[6] *See, e.g.*, 6-ER-1402–03 (███████████████████████████████████
██████████████████████████████████████); 6-ER-1409 (82:7–24) (█████████
██████████████████████████████████████████████); 6-ER-1391
(65:17–24) (█████████████████████████████████████████████████████████
████████████████); 6-ER-1375 (129:14–25) (███████████████████████
████████████████████████████); 6-ER-1419 (108:5–7) (██████████████
█████████████████████████████████████); 6-ER-1362 (147:8–11) (███████
███████████████████████████████████).

In fact, many of the class representatives and individual plaintiffs who were deposed continued to purchase JUUL after filing their complaints.[7]

*Prior smoking history.* Class members vary with respect to whether they smoked cigarettes or used other nicotine products before using JUUL. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. 6-ER-1349 (75:7–15).

████████████████████████████████████████████████████████████████

████████████████████████████████████. 6-ER-1348 (42:24–43:5). Other class members did not smoke cigarettes before using JUUL but used *non*-JUUL vaping devices before that time. 6-ER-1412–14 (149:5–154:20); 6-ER-1312–13 (61:4-21, 88:16-89:5). Other class members had not previously used nicotine products. *See* 6-ER-1417 (63:19–20).

*Reasons for using JUUL.* Many class members who smoked cigarettes before using JUUL began using JUUL as a substitute for cigarettes.[8] These class members identified benefits of JUUL, including that JUUL did not smell like smoke,

---

[7] *See, e.g.*, 6-ER-1399 (65:4–16); 6-ER-1347 (11:10–12); 6-ER-1353 (236:5–9); 6-ER-1434–35 (225:5–12); 6-ER-1439 (94:5–14); 6-ER-1366 (172:14–23).

[8] *See, e.g.*, 6-ER-1365 (92:22–25) ████████████████████████████████
██████████████████████); 6-ER-1339 (35:24–36:5) (█████████████████████
████████████████████████████████████████████████████ 6-ER-1381 (15:2–17) (similar); 6-ER-1373 (16:14–18) (similar); 6-ER-1369 (10:12–17) (similar).

could be used indoors, and tasted better than cigarettes.[9] Many class members who switched to JUUL as a substitute for cigarettes did not smoke during the time they used JUUL.[10] Regardless of whether they were smokers, almost every JUUL user to testify in this litigation said they first used JUUL with a friend or family member and often at that person's suggestion.[11] And regardless of why they started using JUUL, many class members testified that they continued using JUUL because they

---

[9] *See, e.g.*, 6-ER-1350 (84:21–6) (███████████████████████████████████████

███████████████████████████████); 6-ER-1441 (241:5–13) (██████████████████

████████████████████████████████████); 6-ER-1340 (112:11–15)

(████████████████████████████████████████████████████

█████████████████████).

[10] *See, e.g.*, 6-ER-1377–78 (161:21–11) (█████████████████████████████████

████████████████████████████████████); 6-ER-1356 (29:9–17)

(██████████████████████████).

[11] *See, e.g.*, 6-ER-1338 (32:18–25) (███████████████████████████████████

████████████████████████████████); 6-ER-1407 (48:5–9) (██████

███████████████████████████████████); 6-ER-1427 (73:7–20)

(████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████ 6-ER-1458

(150:17–151:2) (████████████████████); 6-ER-1438 (14:7–17) (f████████

████████████).

18

were addicted to nicotine.[12]  Other class members, by contrast, did not become addicted to JUUL.[13]

    ***Impact of advertising.***  The role that advertising played in various class members' decisions about JUUL products also varied.  Some class members did not see any advertising before first using JUUL.  *See*, *e.g.*, 6-ER-1307 (218:13–21); 6-ER-1454 (42:11–14).  Many did not pay attention to or "█████████████████████ ███████████████████████." 6-ER-1341 (122:7–13).[14]  In addition, class members testified that they learned about JUUL from family, friends, or store employees rather than from advertising.  6-ER-1389–90 (49:25–4).  Class members also testified that they did not see or were unaffected by the allegedly fraudulent statements that one JUUL pod contained the same amount of nicotine as a pack of cigarettes or about the

---

[12]   *See, e.g.*, 6-ER-1385 (212:22–25) (████████████████████████████ ███████████████████████████████████████); 6-ER-1370 (161:3–10) (similar); 6-ER-1451 (106:10–18) (similar).

[13]   *See, e.g.*, 6-ER-1392 (68:14–16) (███████████████████████████ ██████████████████).

[14]   *See also, e.g.*, 6-ER-1394 (129:3–21) (██████████████████████ ████████); 6-ER-1418 (99:3–17) (█████████████████████████████████); 6-ER-1451 (██████████████████████████████████████████████████ █████████████████████████████████); 6-ER-1400 (106:1–11) (█████████████████████████████████████).

percentage of nicotine in JUUL.[15]   And no witness said that they received an advertisement for JUUL from Altria.

*Advertising channels and content.*   Class members varied with respect to where they saw JUUL advertising and the content of that advertising.  ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████.   6-ER-1397–98,  1400–02  (41:22–42:7,  106:1–11).   ████

████████████████████████████████████████████████████████████

██████████████████.  6-ER-1309 (328:19–329:9).  Plaintiffs' expert thus conceded that

class members are "████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████."  6-ER-1490 (247:24–248:10); *see also, e.g.*, 6-ER-1486–

87 (73:13–25, 112:2–14) (Plaintiffs' expert testifying that the "██████████████

███████████████████

---

[15]   *See, e.g.*, 6-ER-1462 (296:8–10) (████████████████████████████

██████████████████████████); 6-ER-1393 (75:15–17) (█████████

████████████████████); 6-ER-1446 (198:13–199:4) (similar); 6-ER-1344

(23:15–19) (similar); 6-ER-1357, 59 (46:7–10, 86:13–16) (██████████████

██████████████████████████████); 6-ER-1382–83

(29:20–30:10) (███████████████████████████████████████████

██████████); 6-ER-1325 (90:20–25) (███████████████████████████

██████████████); 6-ER-1428 (77:7–24) (similar); 6-ER-1455 (55:5–11)

(similar); 6-ER-1450-51 (105:25–106:9) (similar); 6-ER-1468 (135:10–23) (██████

████████████████████████████████████).

█████████████████████████████████████████████████

████████").

***Whether class members ever used JUUL.*** Some class members purchased

JUUL but never used the product. ████████████████████████

█████████████████████████████████████████████████

████████████████. 6-ER-1482 (82:11–18).

***How class members obtained JUUL.*** Class members obtained JUUL in many

ways. Some purchased JUUL online using JLI's website and/or a third party's

website, while others purchased at vape shops, convenience stores, and service

stations. *See generally* 3-ER-399 to 4-ER-892. Class members also said JUUL

prices varied from location to location.[16] And many individuals (virtually all

underage) purchased JUUL products on the black market from individuals who were

not retailers.[17] A purchaser who resold the product on the black market would be a

class member, but the underage person who bought the product from the seller and

---

[16] *See, e.g.*, 6-ER-1327 (198:13–199:5) (████████████████████
████████); 6-ER-1440 (227:23–228:23) (similar).

[17] *See, e.g.*, 6-ER-1316 (242:2–16) (████████████████████
████████████); 6-ER-1474 (85:10–23) (████████████
████████████████); 6-ER-1478–79 (61:25–62:9) (similar); 6-ER-1324
(39:9–13) (████████████████████████████████
█████████████████████████████████████████████
████████████████); 6-ER-1321 (113:7–11) (similar); 6-ER-1471
(206:1–10) (similar); 6-ER-1333 (247:6–14) (similar); 6-ER-1465 (36:9–24)
(similar); 6-ER-1461 (252:4–7) (similar).

used it would not be. Class members also varied with respect to whether they were old enough to purchase JUUL lawfully and, if not, the manner in which they circumvented age restrictions.[18]

### 3.   Plaintiffs Offered a Single Injury and Damages Model For All of Their Claims, All Defendants, and All Theories

Despite the significant variability among class members and across the class period—and despite the different claims against different Defendants—Plaintiffs offered a single model of injury and damages prepared by their expert Dr. Hal Singer in support of class certification. 1-ER-31–33.

Dr. Singer sought to measure the amount that JUUL consumers were supposedly "overcharged" when buying JUUL as the result of JLI's failure to warn that JUUL presents health risks and is allegedly more addictive than cigarettes. To collect data for his model, Dr. Singer conducted two similar surveys during a two-month period in 2021. 1-ER-81; 6-ER-1550. One survey asked respondents to compare JUUL products that did and did not come with a hypothetical warning about

---

[18]  *See, e.g.*, 6-ER-1430, 1432–33 (82:6–83:13, 93:8–96:20) (███████████████ ████████████████████████████████); 6-ER-1460 (172:18–174:15) (██████████████████████); 6-ER-1406, 1410–11 (17:4–18, 117:5–8, 121:3–10) (████████████████████████████████████ ██████████████████); 6-ER-1315 (109:4–11) (███████████████████ ████████████████████████████████████████); 6-ER-1422– 24 (28:25–33:4, 190:7–22) (█████████████████████████████████ █████████); 6-ER-1449, 1451 (47:18–24, 107:22–25) (████████████████ ██████).

JUUL's addictiveness.  6-ER-1550–1554.  The second survey was similar, except that the hypothetical warning related to alleged health risks presented by JUUL.  6-ER-1550–1554.



Dr. Singer's surveys asked respondents to choose the product they would prefer among such options.  6-ER-1553–55.

Dr. Singer then purported to analyze these responses and concluded that respondents would be willing to pay less for JUUL if they were told that JUUL was more addictive than cigarettes or carried various health risks. The difference between what consumers actually paid and what survey respondents purportedly would be willing to pay with the warnings is the alleged "overcharge."

Dr. Singer's model produced the exact same amount of "overcharge" for the entire class period—from 2015 onward—regardless of the claim, Defendant, or alleged scheme at issue. 6-ER-1559–64; *see also* 1-ER-82, n.55. Dr. Singer thus found that the amount of overcharge was the same from 2015–2017, before Altria is alleged to have been involved with JLI; the same from 2017–2018 when Altria was negotiating and meeting with JLI; the same from late 2018–2020 when Altria invested in and provided retail services to JLI; and the same from 2020 onward, when Altria no longer provided retail services to JLI.

Similarly, the model found the same damages for the RICO claims against Altria as it did for the California statutory and common law fraud claims against JLI.

Critically, Dr. Singer's model also made no effort to account for the limited role Altria allegedly played in the purported enterprise with respect to time or scope. Plaintiffs allege that Altria engaged in only three of the five purported schemes, but the model did nothing to take this into account.

Indeed, at his deposition, Dr. Singer conceded that he did not "███████████████████████████████" that comprise Plaintiffs' RICO claims. 6-ER-1303 (351:18–24). He further admitted that he had not "██████████████████████████████████████████████████," and could not say if the alleged schemes were "█████████████████████████." 6-ER-1303 (352:5–353:6). Plaintiffs nevertheless claimed that this model showed that injury and damages could be resolved on a class-wide basis for all of their claims and with respect to all of the Defendants. 6-ER-1298–99. The amount of the damages produced by the model for Plaintiffs' RICO claims would be almost $6 billion once trebled. *See* 1-ER-82.

Finally, Dr. Singer purported to calculate the total amount spent on JUUL products by underage purchasers, which Plaintiffs claimed to measure injury and damages incurred by Plaintiffs' proposed youth purchaser classes. 1-ER-82; 6-ER-1563.

### E.    The District Court's Class Certification Order

On June 28, 2022, the district court certified each of the Plaintiffs' proposed classes. *See* 1-ER-3, 95. *First*, the court certified RICO claims on behalf of a Nationwide Purchaser Class that includes all persons who purchased a JUUL product in the United States and a Nationwide Youth Class that includes all persons who purchased a JUUL product in the United States while under the age of eighteen. *See* 1-ER-3, 95. These RICO classes were certified against Altria and the individual

defendants, but *not* JLI, based on the district court's order finding that JLI was itself the RICO "enterprise."

*Second*, the court certified a California Purchaser Class that includes all persons who purchased a JUUL product in California and a California Youth Class that includes all persons who purchased a JUUL product in California while under the age of eighteen. *See* 1-ER-3–4, 95. These classes were certified against JLI and the individual defendants, but *not* Altria.

The court found Dr. Singer's one-size-fits-all injury model sufficient for all of the classes, no matter what the claim or who the defendant was. *See* 1-ER-25–34

As relevant to Altria, the court recognized that Altria's role in the alleged wrongdoing was limited to only certain schemes during certain times. 1-ER-30–31. Nevertheless, the court held that "Singer was not required to—and did not—separate out damages according to Altria's alleged involvement in only some aspects of the racketeering activity." 1-ER-32. The court reasoned that any problems with the model could be addressed after certification, 1-ER-32, 34, and by suggesting that Altria could be liable as part of a "conspiracy," 1-ER-32 ("One may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy") (quotation source omitted).

Beyond that, the court acknowledged that putative class members vary widely in what they believed about JUUL, how they formed their belief, when and why they

first used JUUL, why they continued to use JUUL, where they purchased JUUL, and how they used the product. *E.g.*, 1-ER-3, 9, 18, 35. Nevertheless, the court considered this variability irrelevant so long as a "critical mass" of class members purchased JUUL because of the alleged false marketing. 1-ER-36-37, 39.

## STANDARD OF REVIEW

An order granting class certification is reviewed for an abuse of discretion. *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). "An abuse of discretion occurs when the district court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939 (9th Cir. 2009). This Court has "oft repeated that an error of law *is* an abuse of discretion." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010).

## ARGUMENT

## I. PLAINTIFFS FAILED TO DEMONSTRATE THAT INJURY AND DAMAGES ATTRIBUTABLE TO ALTRIA CAN BE RESOLVED ON A CLASS-WIDE BASIS

### A. Plaintiffs' One-Size-Fits-All Model Violated *Comcast* With Respect to Altria

The district court violated *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), by failing to require Plaintiffs to provide "a model purporting to serve as evidence of

damages in [a] class action must measure only those damages attributable to [plaintiff's] theory." *Id.* at 35. Under *Comcast*, "[i]f the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Thus, to satisfy Rule 23, Plaintiffs needed to "affirmatively demonstrate" with "evidentiary proof" that injury and damages can be determined on a class-wide basis. *Id.* at 33. Plaintiffs did not even attempt to satisfy this standard with respect to Altria. Rather, Plaintiffs offered a single one-size-fits-all model for *all* Defendants, *all* claims, and *all* theories of liability, which ignored that Altria had no involvement with JLI for the majority of the class period.

*First*, Plaintiffs' model failed to account for the fact that Altria's alleged involvement with the purported RICO enterprise did not begin until "Spring 2017 at the earliest," 1-ER-30-31, and thus could not have caused any injury or damages before then. By 2017, JLI had been marketing and selling JUUL products and allegedly engaging in misconduct for almost two years. *See supra* pp. 5–6, 12–13. If Altria was not involved with JLI from 2015 through 2017, it obviously could not have caused injury to purchasers of JUUL during that period. Further, even after 2017, Dr. Singer's model did not consider that JLI's alleged misconduct before Altria was involved would, under Plaintiffs' theory, have continued to impact the price of JUUL after Altria's involvement with JLI. As the district court noted,

Plaintiffs' own experts opined "that the initial youth directed campaigns . . . laid the seeds for the subsequent exponential growth in youth use." 1-ER-30 n.20. Plaintiffs' model therefore includes substantial damages that could not possibly be attributable to Altria.

Indeed, Dr. Singer's model produced the exact same "overcharges" for every year JUUL has been sold—from 2015 onward. If credited, the model would mean that neither Altria's involvement nor anything that occurred after Altria's involvement had *any* impact on JUUL's price, since the alleged overcharge was the same before, during, and after Altria's involvement with JLI.

*Second*, Plaintiffs' model did not account for variations in potential class member injury and damages after Altria was involved with JLI. For example, a class member who purchased JUUL before spring 2017, when Altria was not involved with JLI, cannot show that Altria caused their injuries. A class member who purchased JUUL in 2019, after Altria invested and provided services, might be able to allege that Altria played a role in their harm. And a class member who purchased JUUL after early 2020, when Altria ceased providing retail services, would face significant hurdles. The point is not whether a particular class member can establish causation, injury, and damages. It is that doing so requires a complex person-by-person inquiry of the precise sort that this Court has held precludes class certification in the absence of a model satisfying *Comcast*. *See Bowerman v. Field Asset Servs.,*

*Inc.*, 39 F.4th 652, 663 (9th Cir. 2022) (reversing class certification where model provided no way to calculate damages absent "individual testimony of self-interested class members" resulting in "the 'excessive difficulty' that *Comcast* and our later decisions interpreting *Comcast* have sought to avoid").

Plaintiffs' failure to measure injury or damages attributable to their theory of liability against Altria is not meaningfully in dispute. As the district court found: "Singer was not required to—*and did not*—separate out damages according to Altria's alleged involvement in only some aspects of the racketeering activity." 1-ER-32 (emphasis added). That acknowledgment, alone, should preclude these classes from going forward against Altria.

## B. The District Court Erred In Finding *Comcast* Could Be Satisfied After Certification or Through "Conspiracy" Liability

The district court certified the RICO classes notwithstanding the plain *Comcast* failures for two fundamentally erroneous reasons that warrant reversal.

*First*, the district court found that any issues with Dr. Singer's model with respect to Altria could be addressed *after* class certification: "Altria will be able to argue on summary judgment and at trial that it should not be directly liable under RICO because its conduct did not cause harm to plaintiffs (although conspiracy liability could remain) and that it should not be liable because the conduct that injured plaintiffs was completed by the time Altria joined the alleged RICO enterprise." 1-ER-32, n.22. The court did the same for the model's certification of

youth classes against Altria, when Altria is not even alleged to have participated in JLI's purported "youth access" scheme: "Altria will be free at summary judgment, trial and/or post-trial to argue that its liability for specific claims should be reduced or cut-off at a specific point in time." 1-ER-32, n.21. The court likewise refused to address "Altria's arguments regarding the start or cessation of its liability" because it deemed them "better determined on an evidentiary record considering the requirement of the different claims." 1-ER-33. The district court concluded that Singer's opinions were "closely-enough tethered to plaintiffs' theories of liability, have been shown that they can be adjusted . . . for the merits stage, and establish sufficient fit under *Comcast* at this juncture." 1-ER-29.

But a district court cannot "certify the class merely on the assurance . . . that some solution will be found." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977). "A party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008); *see also In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 188 (3d Cir. 2015) (rejecting class certification based on assurances that an expert's testimony "could evolve to become admissible evidence at trial"). The district court's "close enough" finding fails to "make a 'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common question in one stroke," and should be

reversed. *See, e.g.*, *Olean Wholesale*, 31 F.4th at 666 (quoting *In re Hydrogen Peroxide*, 552 F.3d at 312).

*Second*, the district court held that Dr. Singer did not need to separate Altria's conduct because "all defendants who participated in the RICO enterprise are liable for the entire injury caused by the enterprise's illegal conduct." 1-ER-32 (citing *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir. 2002)). Under the district court's view, *Oki Semiconductor* lets Plaintiffs hold Altria liable under RICO for conduct Altria indisputably did not engage in. But *Oki Semiconductor* held the opposite: that a RICO defendant cannot be liable for conduct that occurred before it was involved in the RICO enterprise.

There, the plaintiff sought to recover under RICO the costs of stolen semiconductors not from the thieves who actually stole the semiconductors, but rather, from a banker who allegedly participated in the enterprise by laundering the ill-gotten proceeds after-the-fact. *Oki Semiconductor*, 298 F.3d at 771–72. This Court held that "RICO liability requires a direct and proximate causal relationship between the asserted injury and the alleged misconduct, which we find absent in this case." *Id.* at 774. The Court explained that "[t]he direct and proximate cause of [plaintiff's] loss was not [defendant's] money laundering at Wells Fargo; it was theft. Only after the theft occurred and the semiconductors were sold could [defendant] launder the proceeds. Her role in the conspiracy, while important, was

not a 'substantial factor in the sequence of responsible causation.'" *Id.* (citation omitted). The banker accordingly could not be held liable under RICO because the plaintiffs failed to establish that the banker's alleged participation in the civil RICO enterprise caused their injury or damages. *Id.*

*Oki Semiconductor* thus precludes imposing liability on Altria here. Plaintiffs allege that the individual defendants alone engaged in "fraudulent marketing" and "youth access" schemes that did not include Altria, starting in 2015. 1-ER-36–37, n.27; 2-ER-374–76 (¶¶ 897–912). Altria is alleged to have engaged only in an after-the-fact "cover-up scheme," and "flavor preservation" and "nicotine content misrepresentation" schemes. These are alleged to have occurred *after* JLI's alleged fraudulent marketing and youth access schemes began. 1-ER-30–31. Just as the banker defendant in *Oki Semiconductor* was not liable under RICO for injuries caused by the underlying theft given that defendant's lack of involvement in that underlying conduct, Altria cannot be liable for injury or damages caused by the alleged false marketing and youth access schemes that did not involve Altria. Plaintiffs bore the burden at the class certification stage of demonstrating that injury or damages caused by Altria or Altria's involvement in the enterprise was amenable to class-wide proof. Plaintiffs offered no such proof.

The district court seemed to acknowledge that Altria could not be liable for offenses committed before joining a conspiracy or after leaving a conspiracy. 1-ER-

32, n.22 (citing *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)). Indeed, courts have applied this principle to civil RICO claims, holding that a RICO co-conspirator cannot be held liable for "acts committed prior to its entry into the conspiracy" and even after entering the conspiracy cannot be held liable unless their conduct resulted in an injury to business or property. *Mattel, Inc. v. MGA Ent., Inc.*, 2010 WL 11463911, at *2–*4 (C.D. Cal. Sept. 3, 2010); *see also, e.g.*, *Bryant v. Mattel, Inc*., 2010 WL 3705668, at *14 (C.D. Cal. Aug. 2, 2010). Nevertheless, the court again incorrectly found that this was a merits issue that did not need to be addressed at class certification. *See supra* p. 26.

*Finally*, the district court also erred when certifying a nationwide class of underage purchasers who seek a full refund of the purchase price of JUUL products. 1-ER-30. The court reasoned that "plaintiffs' theory—as to which Singer's Youth Damages estimates fit—is that defendants caused the product to be marketed to youth with the knowledge that youth would end up finding ways to purchase the product, even if not directly from JLI." 1-ER-30. That reasoning does not apply to and cannot support certification of the Nationwide Youth Class's RICO claim against Altria. Altria is not alleged to have participated in either the "fraudulent marketing scheme" or the "youth access scheme" and thus cannot be liable for injuries caused by these schemes. *See supra* p. 9. Accordingly, even if "Singer's Youth Damages estimates fit" a "youth marketing" theory of liability, those

34

estimates do not "fit" Plaintiffs' theory of RICO liability *against Altria* and therefore cannot support class certification. This is an independent violation of *Comcast* and reinforces the need for reversal here.

## II. COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES GIVEN THE UNDISPUTED VARIABILITY IN THE CLASSES

### A. RICO's Causation Requirement Creates Predominating Individualized Issues Here

Civil RICO requires proof that each class member suffer injury "by reason of" the RICO violation, 18 U.S.C. §1964(c), *i.e.*, that the alleged fraud was the "but for" and "proximate cause" of the injury. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).

This Court has long held that "all plaintiffs asserting civil RICO claims[] must prove individualized reliance where that proof is otherwise necessary to establish actual or proximate causation." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 658 (9th Cir. 2004). And such variability in causation and reliance can foreclose certification. In *Poulos*, for instance, the plaintiffs alleged that casinos conducted a RICO scheme to defraud patrons by allegedly engaging in "fraudulent and misleading acts and omissions intended to induce people to play their video poker and electronic slot machines based on a false belief concerning how those machines actually operate" through false "advertising promotional efforts and concealment of information." *Id.* at 659–60. This Court affirmed the denial of class certification

because causation issues predominated: "Gamblers do not share a common universe of knowledge and expectations—one motivation does not 'fit all.' Some players may be unconcerned with the odds of winning, instead engaging in casual gambling as entertainment or a social activity. Others may have played with absolutely no knowledge or information regarding the odds of winning such that the appearance and labeling of the machines is irrelevant and did nothing to influence their perceptions. Still others, in the spirit of taking a calculated risk, may have played fully aware of how the machines operate. Thus, to prove proximate causation *in this case,* an individualized showing of reliance is required." *Id.* at 665–66.

Despite *Poulos*, the district court concluded that the variability in class members' reliance or reasons for purchasing JUUL did not defeat certification. The district court explicitly found that class members' knowledge, motivations, and expectations concerning JUUL vary widely: "It is undisputed that there are differences among the proposed class representatives and class members, and differences in the 'nicotine journey' of each, such as when they learned about nicotine in JUUL or other e-cigarette products, why they first used or continued to use JUUL or other products containing nicotine, and whether they are addicted to nicotine as a result of their use of JUUL or other nicotine products." 1-ER-9. Indeed, "[e]ach class member deposed testified differently concerning why each started using JUUL, what they knew about JUUL and its nicotine content, and whether they

36

had seen any marketing materials or labels prior to their use." 1-ER-35. The record in fact shows even more variability. *See supra* pp. 15–22.

Given this extreme variability among class members, causation cannot be resolved without individual inquiries into whether and how any purported false advertising or other alleged misconduct caused each class member's alleged losses. As in *Poulos*, class members here "do not share a common universe of knowledge and expectations—one motivation does not 'fit all.'" 379 F.3d at 665–66. And in similar cases involving claims against cigarette manufacturers, courts have found individualized issues predominate. In *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008), the court held that "[i]ndividualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative—for example, if a Lights smoker was unaware of that representation, preferred the taste of Lights, or chose Lights as an expression of personal style."

The same is true here. For example, a class member cannot establish causation or reliance if they "would have bought or sold [a product] even had [they] been aware that the [product's] price was tainted by fraud." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014); *see also, e.g.*, *Zito v. Leasecomm Corp.*, 2003 WL 22251352, *19 (S.D.N.Y. Sept. 30, 2003) (RICO claims fail where harm is "alleged to have flow[ed] from [plaintiffs'] voluntary decisions to enter into

business transactions"); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (causation is an individual inquiry because "some putative class members may have known about the presence of [the concealed ingredient] and bought fountain Diet Coke anyway"). And if a class member "did not view [the defendant's] statement until after suffering injury, then viewing the statement could not have been the 'immediate cause' of the injury." *Phillips v. Apple Inc.*, 2016 WL 1579693, at *7 (N.D. Cal. Apr. 19, 2016). There is no way to resolve these issues without individual inquiries into each class member's beliefs, motivations, and exposure, if any, to alleged improper marketing.

The district court acknowledged that courts have held "that consumers who did not see misrepresentations until after suffering injury or who continued to purchase product after they learned of the fraud could not show that defendants' misrepresentations were a cause of their injury." 1-ER-40–41 n.29. Nevertheless, the court found these decisions "unremarkable" because "each of the proposed class representatives has testified that she or he saw JUUL marketing before their first purchase" and "[w]hether class members would have continued purchasing product but for their first purchases is a disputed matter subject to expert testimony as well as individual testimony." *Id.*

The court's reasoning underscores individual issues necessitating individual proof and not common questions that distinguish this case from other in which

38

certification was denied. For example, the mere fact that a class representative "saw JUUL marketing before their first purchase" tells us nothing about whether *other* class members saw such marketing, let alone that they believed the marketing and purchased JUUL because of it. Nor would proof that a class member first purchased JUUL because of marketing establish that they did so on every subsequent occasion, or that other class members did the same. In addition, the court's observation that the reasons for a class member's continued purchases depends on "individual testimony" only confirms the individual nature of this issue. And the court again erred when concluding that these class certification issues would be "more appropriately addressed on summary judgment, at trial, or post-trial," 1-ER-40–41 n.29; *see also supra* pp. 30–31.

The district court overlooked additional individualized issues posed by the RICO claims against Altria in particular. Plaintiffs' claims against Altria are confined to only three of five schemes of misconduct and a fraction of the class period. *See supra* p. 9. The "flavor preservation" scheme alleges that an October 2018 letter Altria sent to the FDA helped keep mint-flavored JUUL products available for roughly one more year, until November 2019. *See supra* p. 9. At most, this scheme could have caused a class member's injury only if that person bought mint-flavored JUUL during this time and would not have purchased a different

JUUL product if mint was not available. These questions are inherently individualized.

The "cover-up scheme" also raises individual issues. This scheme claims that Altria sought to "cover up" JLI's alleged youth marketing—after that conduct already had stopped and JLI was already being sued for it—by providing "Make the Switch" advertisements for JUUL products to adult smokers. *See supra* pp. 9, 33. Putting aside the facial absurdity of this theory, only a small number of class members received one of these ads, and far fewer purchased JUUL because of them. *See supra* pp. 19–20 and notes 14–15. Most class members began using JUUL before or after the short period when Altria disseminated the ads. *See supra* pp. 14–15. Many class members also did not smoke cigarettes and would not have received or been interested in representations directed at smokers that compared JUUL to cigarettes. And even among smokers who began using JUUL when the advertisements were disseminated, many did not see or pay attention to the ads or began using JUUL for unrelated reasons, such as encouragement from friends or family. *See supra* pp. 17–20 and notes 8–15.[19]

---

[19] In addition, a class member who stopped smoking when starting JUUL, as many individuals did, *see supra* pp. 16–17, received what was allegedly promised—a product that helped them quit smoking—and cannot prove injury. *See infra* p. 48.

Last, the "nicotine content misrepresentation scheme"—which claims that statements on JUUL packages misstated the amount of nicotine JUUL contained—raises additional individual issues. *See supra* pp. 9, 35–36. Based on testimony from JUUL purchasers, many class members were unaware of these statements, did not know what they meant, and paid no attention to them. 6-ER-1462 (296:8–10) (███████████████████████████████████████████████████████ ███████); 6-ER-1393 (75:15–17) (████████████████████████████████ ████████████████████████████████████████████████████).[20] These class members cannot establish reliance or causation, and identifying them would require an individualized inquiry in each class member's exposure and reaction to the specific nicotine-related representations at issue.

In any other case, involving any other product, the undisputed, class-wide variability with respect to whether and how advertisements and other alleged misconduct caused any losses would have doomed certification.

---

[20] *See also, e.g.*, 6-ER-1382–83 (29:20–30:10) (████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████); 6-ER-1325 (90:20–25) (████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████); 6-ER-1428 (77:7–24) (similar); 6-ER-1455 (55:5–11) (similar); 6-ER-1450–51 (105:25–106:9) (similar); 6-ER-1468 (135:10–23) (████████████ ████████████████████████████████████████████████); 6-ER-1357, 59 (46:7–10, 86:13–16) (████████████████████████████████████████████████████████████████████████████ ████████).

## B. The District Court Erred By Misapplying *Bridge* and Adopting a Novel "Critical Mass" Causation Theory

The district court acknowledged that *Poulos* and other decisions have held that class certification is inappropriate where class members vary substantially on whether the defendants' conduct, or some other factor, caused them to purchase the product. 1-ER-24. The court cast aside these decisions because "*Poulos* was decided prior to the Supreme Court's decision in *Bridge*. There, the Court made clear that first-party reliance is not necessary for RICO class claims." 1-ER-25; *accord* 1-ER-21–22 (finding other decisions "undermined" by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

But *Bridge* did not say reliance is irrelevant in all RICO cases. It merely permitted auction bidders to sue under RICO where the defendant made misrepresentations to the county running the auction, and the county's reliance on those misrepresentations in turn harmed the bidders. 553 U.S. at 648–49. While the Court concluded that *direct* reliance was not required under the facts in that case, it made clear that it was *not* holding "that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 658 (emphasis in original).

The district court gave lip service to *Bridge's* admonition that "someone" needed to rely on the alleged misrepresentation in order to trigger RICO liability. 1-ER-36. But it circumvented the requirement by adopting a judge-made "critical

42

mass" exception applied by another court in the Northern District of California in an order that has since been reversed. 1-ER-35–36 (adopting "critical mass" exception from *Postpichal v. Cricket Wireless, LLC*, 2021 WL 3403146 (N.D. Cal. Aug. 4, 2021), *class certification rev'd in later proceedings*, *Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061 (N.D. Cal. July 29, 2022)). Under this "critical mass" theory, so long as *some* consumers were deceived by alleged misrepresentations about a product, *all* consumers can sue under RICO, even ones who never were exposed to or influenced by the alleged fraud. 1-ER-35–36 This "critical mass" approach is erroneous and should be rejected for several reasons.

For one, under *Bridge*, the "someone" who must have relied on the alleged misrepresentation must have been "someone *in the chain of causation*." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, 943 F.3d 1243, 1260 (9th Cir. 2019) (emphasis added). Consistent with *Bridge*, this Court in *Painters* found this requirement met by third party payors that had not been exposed to the alleged fraud but claimed to have paid for prescriptions written by doctors in reliance on the alleged fraud. *Id.* Allowing RICO claims based on indirect reliance in that situation, where a plaintiff did not see the alleged fraud but can trace their injury directly to the defendant through someone who did see it and rely, is fundamentally different from the situation here. In this case, many class members saw the alleged fraud but did not believe it or purchased JUUL products for unrelated

reasons, and their purchasing decisions had nothing to do with third party reliance, "critical mass" or otherwise.

Beyond that, the "critical mass" theory contravenes RICO's direct injury requirement. The Supreme Court has long held that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Holmes v. Sec. Prot. Corp.*, 503 U.S. 258, 268–69 (1992); *accord Or. Laborers-Emp. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (finding no RICO causation where plaintiff's claims "rel[ied] on alleged injury to [third party] smokers").

If upheld, the district court's "critical mass" theory will provide a road map for any plaintiff in any false-advertising or other misrepresentation-based case to sidestep the need to prove reliance and proximate cause by asserting that the market price of a consumer product was inflated because some amorphous and unknown "critical mass" of consumers relied on the alleged fraud. And it would encourage plaintiffs to convert federal RICO claims into the mirror-image of consumer tort claims, despite this Court's admonition that RICO should not "provide a federal

cause of action and treble damages to every tort plaintiff." *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994).[21]

### C. Article III's Injury-in-Fact and RICO's Injury To Business or Property Requirements Raise Predominating Individual Issues

The district court also disregarded other predominating individualized issues with respect to the RICO claims against Altria. Under Article III a plaintiff must suffer an injury-in-fact, and RICO plaintiffs must additionally prove that they were "injured in [their] business or property." 18 U.S.C. § 1964(c). Yet here, the district court certified classes of many purchasers who suffered no injury at all, much less an injury to business or property. And when a class includes individuals "who in fact suffered no injury," the "need to identify those individuals will predominate . . . absent . . . some other mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights," and the district court

---

[21] In addition to causation, "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes" that are RICO predicate acts. *Neder v. United States*, 527 U.S. 1, 25 (1999). "Courts have said that how a particular decisionmaker would have reacted to particular statements is relevant to whether those statements were material," *United States v. Yang*, 2019 WL 5536213, at *2 (N.D. Cal. Oct. 25, 2019) (Koh, J.), and therefore "materiality must be assessed in the context in which the communications occurred," *United States v. Bogucki*, 2019 WL 1024959, at *2 (N.D. Cal. Mar. 4, 2019). "In consequence, industry practices, agreements between the parties, and other information known to the parties at the time of the allegedly false statements are relevant to assessing those statements' materiality." *Id*. Plaintiffs' RICO theory is based on a wide range of allegedly fraudulent statements and therefore materiality cannot be resolved based on a single objective standard.

identified no such mechanism. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018). This reinforces the need for reversal of the class certification order here.

*First*, Plaintiffs "fail[] to establish a RICO injury where the injury 'flow[ed] from [their] voluntary decisions'" or was "voluntarily assumed." *Cadle Co. v. Flanagan*, 2005 WL 8167447, at *4 (D. Conn. Feb. 11, 2005) (quoting *Zito*, 2003 WL 22251352, at *19). Likewise, there is no injury to business or property where a plaintiff could have "avoid[ed] any injury simply by walking away from the alleged wrongdoers." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 187–88 (3d Cir. 2000). It is undisputed that many class members voluntarily purchased JUUL products with knowledge of the alleged fraud—indeed, many continued to purchase JUUL products after filing a lawsuit against JLI. *See supra* pp. 15–16, 19–20, and notes 4–7. These class members, who can be identified only through individual inquiries, cannot establish RICO injury. Nor can continued purchases be explained away by addiction; addiction to nicotine is a "highly individualistic inquiry." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 134 (3d Cir. 1998).

The district court acknowledged this line of RICO decisions but found them inapplicable based on Plaintiffs' "conten[tion]" that these individuals comprised "a small fraction of class members." 1-ER-41. But relying on "contentions" instead of evidence when deciding class certification contravenes Supreme Court and this

Court's precedent. *See, e.g.*, *Olean Wholesale*, 31 F.4th at 665 (holding evidence is needed to secure certification).

*Second*, class members cannot establish injury to business or property for JUUL purchases if they used someone else's money to make the purchase or sold the JUUL they bought to someone else on the black market, for example. Even if this individual was "overcharged" when buying JUUL at retail, they used someone else's money to pay the purported overcharge or immediately recovered it when selling the JUUL product to a third party (typically, minors). These individuals did not suffer a "concrete financial loss" and suffered no injury under RICO. *Steele*, 36 F.3d at 71. The district court summarily stated that Plaintiffs' expert Dr. Singer "accounted for that issue in his analysis, and defendants' reseller arguments provide, at most, grounds for cross-examination." 1-ER-43. But Dr. Singer did not address this issue. The paragraphs of his report cited by the district court refer to how his survey was conducted; they do not explain how the court can identify without individual mini-trials the class members who re-sold the JUUL they purchased. 1-ER-43 (citing Singer Reply Rep. ¶¶141, 165).

*Finally*, "Rule 23 also requires the district court to determine whether individualized inquiries into [Article III standing] would predominate over common questions." *Olean Wholesale*, 31 F.4th at 668 n.12; *accord Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 663 (9th Cir. 2022) ("[T]he class members cannot show

by common evidence that individual class members would be entitled to overtime wages or to expense reimbursement if found to be employees. Thus, the class members cannot show that the whole class suffered damages traceable to their alleged misclassification as independent contractors.").

Here, many underage purchasers of JUUL products obtained those products from older consumers who purchased and then resold to them. *See supra* pp. 21–22 and note 17. These older individuals suffered no injury under Article III, profited from their illegal sales to minors, and would be "rewarded" with treble damages if this class is permitted to go forward. *See Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *13 (W.D. Wash. July 22, 2021) (Resellers "would not have suffered any damages at all because they would have passed on any overpayment at the original point of sale to the . . . unwitting new owner.").

Further, the class includes many individuals who purchased JUUL not due to any alleged improper marketing, but rather because they preferred using a non-combustible nicotine-containing product over smoking traditional combustible cigarettes. *See supra* pp. 16–17 and note 9; 6-ER-1497–98. These individuals received precisely what they sought—a nicotine-containing product that allowed them to transition away from combustible cigarettes. 6-ER-1504.

Moreover, Dr. Singer's own data shows that many individuals were willing to pay *more* for JUUL products with a label indicating that JUUL was more addictive

48

or presented safety issues—the very information that Plaintiffs claim JLI misrepresented or omitted. Forty percent of respondents preferred products with the disclaimer in the Safety Risk Survey and 18% preferred products with the disclaimer-label in the Addiction Risk Survey. 6-ER-1509–10. And Dr. Singer conceded in his deposition that there are rational reasons why someone might be willing to pay *more* for a vapor product even if it were more addictive than traditional cigarettes. 6-ER-1302 (187:11–19). Consumers who were willing to pay *more* for JUUL than they actually did pay did not suffer any injury in fact.

The individual issues raised by Article III injury-in-fact, and the many class members who suffered no such injury, present further reason to reverse the district court's certification of nationwide RICO classes against Altria.

\* \* \*

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. Plaintiffs seeking to employ this exception thus must satisfy the "demanding" requirement of predominance, *id.* at 34, and a district court must conduct a "rigorous analysis" to ensure all requirements of Rule 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). Yet, at every turn, Plaintiffs here failed to meet this burden with respect to Altria, a secondary defendant that was largely an afterthought in Plaintiffs' class certification model and motion. The district court

likewise found certification possible only by deferring key issues and vastly expanding civil RICO in ways that, if upheld, will create bad law that transcends this case. This Court should reject the district court's approach and decertify the classes.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order certifying RICO claims against Altria.

Dated: February 1, 2023

Respectfully submitted,

 /s/ John C. Massaro
John C. Massaro
David E. Kouba
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
Telephone: (202) 942-5000

Lisa S. Blatt
Sarah Harris
Williams & Connolly LLP
680 Maine Avenue SW
Washington, D.C. 20024
Telephone: (202) 434-5050

James M. Rosenthal
Wilkinson Stekloff LLP
2001 M Street, NW, 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000

## CERTIFICATE PURSUANT TO CIRCUIT RULES 5-2 AND 32-3

I certify that the attached petition includes 11,983 words as counted by the word-counting feature of Microsoft Word (not including those portions excluded by Fed. R. App. P. 32(f)) and, so, complies with Circuit Rules 5-2 and 32-3.

Dated:  February 1, 2023        *  /s/ John C. Massaro*
                                        John C. Massaro
                                        Arnold & Porter Kaye Scholer LLP
                                        601 Massachusetts Avenue NW
                                        Washington, D.C. 20001
                                        Telephone:  202-942-5000
                                        Facsimile:  202-942-5999
                                        John.Massaro@arnoldporter.com

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Altria notifies the Court that *J.D. v. Hoyoung Huh, et al.* (No. 22-16694) and *J.D. v. Juul Labs, Inc.* (No. 22-16695), , are appeals of the same class certification order filed by Altria's co-defendants in the district court action.  On January 10, 2023, this Court administratively closed those appeals.  Altria is not aware of any other related cases currently pending before this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.


Dated: February 1, 2023            _/s/ John C. Massaro_
                                    John C. Massaro
                                    Arnold & Porter Kaye Scholer LLP
                                    601 Massachusetts Avenue NW
                                    Washington, D.C. 20001
                                    Telephone: 202-942-5000
                                    Facsimile: 202-942-5999
                                    John.Massaro@arnoldporter.com